UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JUSTIN PIERCE, Derivatively on Behalf of FERRELLGAS PARTNERS, L.P., <br><br> Plaintiff, <br><br> v. <br><br> JAMES E. FERRELL, ALAN C. HEITMANN, STEPHEN L. WAMBOLD, FERRELLGAS, INC., <br><br> Defendants, <br><br> - and - <br><br> FERRELLGAS PARTNERS, L.P., <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.

VERIFIED CLASS AND DERIVATIVE ACTION COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiff Justin Pierce ("Plaintiff"), by his undersigned attorneys, for this Verified Derivative Complaint, alleges upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.     This is a unitholder class and derivative action brought by Plaintiff on behalf of nominal defendant Ferrellgas Partners, L.P. ("Ferrellgas" or the "Partnership") and its unitholders against its general partner, Ferrellgas, Inc. (the "General Partner"), and certain of the General Partner's current and former officers.  These wrongs resulted in hundreds of millions of dollars in damages to Ferrellgas' reputation, goodwill, and standing in the business community.  In addition, the defendants' wrongdoing increased the Partnership's borrowing costs at a time when it is desperate for capital.  Moreover, these actions have exposed the Partnership to millions of dollars in potential liability for violations of state and federal law.  Finally, the defendants' failure

to abide by the Partnership Agreement (as defined herein), and the aiding and abetting of that failure, severely harmed the value of the Class' (as defined herein) limited partnership units.

2.     On June 1, 2015, Ferrellgas announced that it was buying a midstream service provider, Bridger Logistics, LLC ("Bridger"), for nearly $840 million (the "Bridger Acquisition").  This was a major acquisition for the Partnership and one which the Individual Defendants (as defined herein) claimed would be transformative and significantly diversify Ferrellgas' assets.  A year and a half later, Ferrellgas' unitholders and the public at large learned that the Bridger Acquisition was a complete disaster.

3.     The General Partner knew that the Bridger Acquisition was a debacle.  Bridger was almost completely dependent on a single customer.  The only way to service that single customer was to transfer crude oil through a facility in Eddystone, Pennsylvania (the "Eddystone Facility").  The owner of the Eddystone Facility and Bridger had an agreement that Bridger would move a minimum amount of crude oil through the facility or pay an amount based on there being a deficiency.  For an untold amount of time Ferrellgas, through Bridger, was not moving a sufficient amount of crude oil through the Eddystone Facility and, as a result, was making the deficiency payments.  Then, through a shady agreement, Bridger unloaded the contract with the Eddystone Facility to Jamex (as defined herein), an entity connected with Ferrellgas' officers.  At that point, Ferrellgas, Bridger, and Jamex stopped moving crude oil through the Eddystone Facility, triggering millions of dollars' worth of deficiency payments.

4.     None of this information was disclosed to the public or the Partnership's outside unitholders.  It was only after Eddystone Rail (as defined herein) sued Ferrellgas to enforce a subpoena issued by an arbitration panel that the public started to learn the truth about Bridger.

5.     Then, after months of touting the Bridger Acquisition, on September 28, 2016, the General Partner made an abrupt face, announced that it was no longer planning on serving Bridger's one customer, that it was writing down the value of the Bridger Acquisition over $650 million, over 77% of the amount that the Partnership paid, entered into a significant settlement with Jamex that acquired the Eddystone Facility services agreement, and would need to drastically cut its quarterly distribution to unitholders because Ferrellgas was about to breach the leverage limit that it entered into with its secured credit facility provider.

6.     In the wake of the September 28, 2016 disclosure, Ferrellgas' stock plunged more than 28%, or $4.73 per share on September 29, 2016, to close at $11.77 compared to the September 27, 2016 trading day's closing of $16.50, erasing over $459 million in market capitalization.

7.     Further, as a direct result of this unlawful course of conduct, the Partnership is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Southern District of New York on behalf of investors who purchased Ferrellgas' units.  Also, in order to reduce its leverage profile, the Partnership has had to raise additional funds on less favorable terms in light of the wrongdoing described herein.

8.     The General Partner failed to act in good faith to the Partnership's unitholders when it made these repeated improper statements to the Class and the public, as was required by the Partnership Agreement.  By entering into secret agreements and making misleading statements, the General Partner also breached the implied covenant of good faith and fair dealing that it owed unitholders.  The Class and the Partnership were damaged significantly by these wrongful acts.  Accordingly, Plaintiff now brings this class and derivative action.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class reside in states other than the states in which defendants are citizens.

10.    Venue is proper in this Court because: (i) nominal defendant Ferrellgas maintains its principal place of business in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.    Plaintiff was a unitholder of Ferrellgas at the time of the wrongdoing complained of, has continuously been a unitholder since that time, and is a current Ferrellgas unitholder.

**Nominal Defendant**

12.    Nominal defendant Ferrellgas is a Delaware limited partnership with principal executive offices located at 7500 College Boulevard, Suite 1000, Overland Park, Kansas. Ferrellgas is primarily engaged in the retail distribution of propane and related equipment sales and midstream operations comprised of a crude oil logistics segment and a water solutions segment.  Ferrellgas is a holding entity that conducts no operations, and all management functions for the Partnership are performed by defendant General Partner.  While Ferrellgas technically has no employees, it instead reimburses defendant General Partner for all executive

officer compensation. Therefore, Ferrellgas, not defendant General Partner, actually pays the compensation.

**Defendants**

13. Defendant James E. Ferrell ("Ferrell") is defendant General Partner's Interim Chief Executive Officer ("CEO") and President and has been since September 2016; Chairman of the Board of Directors (the "Board") and has been since 1965; and a director and has been since 1984. Defendant Ferrell was also defendant General Partner's Executive Chairman of the Board from at least September 2009 to September 2013; CEO from October 2000 to September 2009 and from at least October 1995 to August 1998; and President from at least July 2000 to April 2006 and from at least October 1994 to October 1996. Defendant Ferrellgas paid defendant Ferrell the following compensation:

| Fiscal Year[1] | Fees Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $200,000 | - | $200,000 |
| 2015 | $200,000 | $1,087,500 | $1,287,500 |

Defendant Ferrell is a citizen of Kansas.

14. Defendant Alan C. Heitmann ("Heitmann") is defendant General Partner's Chief Financial Officer and Executive Vice President and has been since January 2015. Defendant Heitmann was also defendant General Partner's Senior Vice President of Finance and Investor Relations from 2013 to January 2015; Vice President of Accounting and Finance from 2008 to 2013; Vice President from 2006 to 2008; Corporate Controller from 2005 to 2008; Retail Controller from 2001 to 2005; and Assistant Controller from 1995 to 2001. Defendant Ferrellgas paid defendant Heitmann the following compensation:

---

[1] In both 2015 and 2016, Ferrellgas' fiscal year ended on July 31st.

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $375,000 | - | $651,388 | $30,531 | $1,056,919 |
| 2015 | $298,593 | $250,000 | $671,820 | $33,230 | $1,253,643 |

Defendant Heitmann is a citizen of Missouri.

15. Defendant Stephen L. Wambold ("Wambold") was defendant General Partner's President from April 2006 to September 2016; CEO and a director from September 2009 to September 2016; Chief Operating Officer from April 2006 to September 2009; Senior Vice President of Operations from 2005 to 2006; a Region Vice President from 2003 to 2005; and a General Manager from 1997 to 2003. Defendant Ferrellgas paid defendant Wambold the following compensation:

| Fiscal Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $700,000 | $632,566 | $29,180 | $1,361,746 |
| 2015 | $700,000 | $1,778,450 | $28,498 | $2,506,948 |

Defendant Wambold is a citizen of Kansas.

16. Defendant General Partner is a Delaware corporation with principal executive offices located at 7500 College Boulevard, Suite 1000, Overland Park, Kansas. Defendant General Partner performs all management functions for Ferrellgas while owning a 1% general partner interest in Ferrellgas. Defendant General Partner is 100% owned by Ferrell Companies, Inc. ("Ferrell Companies"), which is 100% owned by an employee stock ownership trust. As of October 31, 2016, Ferrell Companies owned 23.4% of Ferrellgas' outstanding common units. As of September 6, 2016, defendant General Partner had 3,908 full-time employees.

17. The defendants identified in ¶¶13-15 are referred to herein as the "Individual Defendants."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

18.     In committing the wrongful acts alleged herein, the General Partner and Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

19.     During all times relevant hereto, the General Partner and Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including unitholders of Ferrellgas, regarding the General Partner and Individual Defendants' management of Ferrellgas' operations.  In furtherance of this plan, conspiracy, and course of conduct, the General Partner and Individual Defendants, collectively and individually, took the actions set forth herein.

20.     The General Partner and Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the General Partner and Individual Defendants caused the Partnership to issue improper public statements.

21.     The purpose and effect of the General Partner and Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the General Partner's and Individual Defendants' violations of the Partnership Agreement and to conceal adverse information concerning the Partnership's operations, financial condition, and future business prospects.

22.     The General Partner and the Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Partnership to purposefully or recklessly release improper statements.

23.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

24.     Ferrellgas has no independent operations or employees. Rather, it is a holding entity that owns 100% of Ferrellgas Partners Finance Corp. and 99% of Ferrellgas, L.P. (the "Operating Partnership").   The Operating Partnership is the source of substantially all of Ferrellgas' consolidated assets, sales, and operating earnings, except for interest expense related to the senior notes co-issued by Ferrellgas Partners, L.P. and Ferrellgas Partners Finance Corp.

25.     Pursuant to the Agreement of Limited Partnership of Ferrellgas, and all amendments or restatements thereof (the "Partnership Agreement"), the Partnership is run by the General Partner.  In fact, Ferrellgas does not even have its own board of directors.  Thus, the General Partner completely controls all of Ferrellgas' decisions, including the statements that it makes to the public and the dividends it provides its unitholders.  Ferrell Companies is the parent and sole unitholder of the General Partner.  In addition Ferrell Companies owns approximately 23.4% of the Partnership and defendant Ferrell, Ferrell Companies Chairman of the Board and interim CEO, owns another 4.9% of the Partnership.  Defendant Ferrell is the son of the founder of Ferrellgas, A.C. Ferrell.

26.     The following flowchart shows the interlocking relationship between Ferrellgas, the General Partner, defendant Ferrell, Ferrell Companies, and public unitholders.



27.     Pursuant section 6.10 of the Partnership Agreement, the General Partner owed and owe Ferrellgas and its unitholders a duty to only act in the best interests of Ferrellgas not in furtherance of its own interest or benefit.

28.     In addition, section 6.8 of the Partnership Agreement prohibits the indemnification of the Individual Defendants for actions not taken in good faith.

## FERRELLGAS' DISASTROUS BRIDGER ACQUISITION CAUSES THE PARTNERSHIP SIGNIFICANT LONG-TERM DAMAGE

29.     On June 1, 2015, Ferrellgas announced that it would acquire Bridger for $837.5 million.  The consideration for the purchase was in the form of $562.5 million in cash, of which,

the majority was through issuance of debt, and 11.2 million common units of Ferrellgas.

30.    This deal represented a major expansion of the Partnership's business by adding substantial midstream crude oil assets and operations.  Bridger transported crude oil to refineries and other end users with a network of pipelines, trucks, railcars, and barges.  Prior to the Bridger Acquisition, the Partnership's operations consisted of propane and related equipment sales and the operation of salt water disposal wells.

31.    After the close of the Bridger Acquisition, all of Bridger's employees became employees of the Partnership and Bridger operated as a standalone subsidiary of Ferrellgas, including all major officers, except for Bridger's Chief Marketing Officer, James H. Ballengee ("Ballengee").    In addition, the Partnership did not acquire one entity of Bridger–Bridger Marketing LLC ("Bridger Marketing").  Once the Bridger Acquisition closed, Ballengee became the CEO and manager of Bridger Marketing, which changed its name to Jamex Marketing, LLC ("Jamex").  Jamex LLC, an affiliate of Jamex Marketing, and also owned by Ballengee, received the 11.2 million common units of Ferrellgas, equal to approximately 11.5% of the Partnership's common units.    Jamex entering into a registration rights agreement with the Partnership concerning these units.  Also party to this agreement was Rios Holdings, Inc. and Gamboa Enterprises, LLC, which are run by Julio E. Rios II ("Rios") and Jeremy H. Gamboa ("Gamboa"), respectively the CEO and Chief Operating Officer of Bridger, now the midstream operations of Ferrellgas.

32.    Ferrellgas entered into an agreement with Jamex at the same time as the purchase. Pursuant to this agreement, Jamex was to source crude oil for Bridger to Monroe Energy LLC ("Monroe"), Bridger's largest customer, accounting for 80% of Bridger's adjusted earnings before

interest, taxes, depreciation, and amortization ("EBITDA"). In addition, Jamex was responsible for paying certain amounts to Ferrellgas.

33. The last stop before delivery of the crude oil to Monroe is the Eddystone Facility. The Eddystone Rail Company, LLC ("Eddystone Rail") owns that facility.

34. Bridger initially obtained the exclusive use of the Eddystone Facility through a service agreement. Part of this agreement called for Bridger to deliver minimum amounts of crude oil through the Eddystone Facility. If Bridger did not meet this minimum volume requirement, it was required to make deficiency payments to Eddystone Rail. Unknown to unitholders, Bridger was not meeting this minimum volume requirement and thus made deficiency payments to Eddystone Rail. Then, again, unbeknownst to unitholders, in February 2016, Ferrellgas sold the terminal contract to an affiliate, Jamex. This was a particularly strange transfer because the arrangement with Jamex and the Partnership was only to source crude oil, not the logistics behind transferring the crude oil.

35. According to Eddystone Rail, immediately after the sale, Bridger stopped bringing trains in and out of the Eddystone Facility and Jamex stopped all performance under the service agreement with Eddystone Rail.

36. Because of a minimum amounts contract, Jamex continued to owe Eddystone Rail approximately $5 million a month, even though it was not using the facility. Jamex, however, did not pay Eddystone Rail. Eddystone Rail initiated arbitration demanding Jamex pay it tens of millions of dollars. Jamex claimed a number of affirmative defenses concerning the quality of the Eddystone Facility. In particular, Jamex said that the freight train could not operate near the Philadelphia airport during the day and that a river channel was not as deep as needed, and thus

the oil barges could only be moved at high tide. Notably, all of these claimed deficiencies existed at the time of the Bridger Acquisition.

37.     As part of the arbitration proceedings, the arbitration panel issued a subpoena on Ferrellgas that it appear at a preliminary hearing on July 29, 2016, and produce certain documents. Ferrellgas refused, stating that it would not comply with any ruling by the arbitration panel regarding the subpoena.

38.     On August 10, 2016, Eddystone Rail moved to enforce those subpoenas in federal court in the Southern District of New York. Eddystone Rail's public filings to enforce the subpoenas were the first time that the Class and public learned anything about the arbitration proceedings and problems with Bridger.

39.     Soon after, Ferrellgas and Jamex entered into a settlement terminating their relationship. The agreement called for Ferrellgas to receive a promissory note from Jamex for $49.5 million. The promissory note originally had an interest rate of 7%, but that was reduced to 2.8% after the Partnership's quarterly distribution. The promissory note is guaranteed up to a total amount of $20 million by Ballengee and an entity connected to him called Bacchus Capital Trading, LLC. Additionally, Ferrellgas, through Bridger, is providing Jamex a revolving secured working capital facility in the amount of $5 million at "an annual interest rate of 0%." Finally, Ferrellgas repurchased from Jamex (and canceled) 850,000 common units at a cost of $16.8 million.

40.     At the time of this settlement, Jamex owed Ferrellgas (through Bridger) nearly $50 million and Ferrellgas was seeking another $8.1 million adjustment to working capital. These amounts were effectively forgiven in the settlement.

41.    Despite the promissory note, the Partnership announced that it "[did] not anticipate any material contribution to revenue or EBITDA from Jamex or [Monroe] in the future." In addition, the Partnership wrote down over $650 million in the business segments it gained by acquiring Bridger, meaning the Partnership's purchase for $837 million was worth less than $200 million now.

42.    In addition, the Jamex settlement and its poor operating results (detailed further herein) meant that the Partnership was dangerously close to exceeding the leverage ratio limit of 5.5 times in its secured credit facility.[2]  As a result, the Partnership was required to amend its credit facility, increasing the leverage ratio limit to 5.95-6.05 times.  As of October 31, 2016, the Partnership's leverage ratio was 5.81 times.

43.    On October 18, 2016, the General Partner told Rios and Gamboa that they should begin work independently of the Partnership and to come up with ideas for Bridger.  On October 21, 2016, Rios and Gamboa delivered notices of "good reason" for resignation to the General Partner, alleging that their responsibilities were materially diminished and stating their intention to resign as a result if such purported material diminution was not cured within thirty days. On November 28, 2016, Rios and Gamboa resigned stating that they intend to make a claim for severance.  It appears that this dispute is still pending.

44.    On January 24, 2017, Ferrellgas sold $175 million worth of senior notes in a private placement.  The notes were sold to pay down the Partnership's borrowing under its secured credit facility.  On information and belief, the terms of these notes were less favorable to the Partnership due to the wrongful actions detailed herein.

---

[2] The leverage ratio is defined as the ratio of total debt of the operating partnership to trailing twelve month EBITDA of the operating partnership (adjusted for certain, defined items).

45.     Finally, on February 2, 2017, Eddystone Rail brought a lawsuit against the Partnership, Bridger, the General Partner, Rios, and Gamboa.  Eddystone Rail claims that the Partnership is liable to it for all amounts owed to it by Jamex due to its control over Jamex.

## IMPROPER STATEMENTS

46.     As explained in more detail herein, the defendants were unabashedly positive about the Bridger Acquisition.  Defendant Wambold called it "a large step forward in our plans to strategically diversify our revenues" and the "deal that we have been looking for since day one."  The Bridger Acquisition, however, was a total disaster for the Partnership.  As described above, Bridger was almost completely dependent on a single contract. When that contract was terminated, Bridger lost three-fourths of its value.

47.     On June 1, 2015, Ferrellgas issued a press release announcing that it has entered into an agreement to acquire Bridger for $837.5 million.  The press release claimed that "[w]ith the addition of Bridger, Ferrellgas now offers a comprehensive portfolio of crude-focused midstream assets, diversifying its existing asset base and creating a platform from which to execute its long-term midstream growth initiatives."  The press release stated:

**Ferrellgas Partners to Acquire Bridger Logistics; Announces Distribution Increase**

OVERLAND PARK, Kan., June 1, 2015 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) today announced that it has entered into a definitive purchase and sale agreement to acquire Dallas-based Bridger Logistics, LLC, a provider of integrated crude oil midstream services, for a purchase price of approximately $837.5 million, subject to certain closing adjustments. In conjunction with this transaction, Ferrellgas also announced that its Board of Directors has approved a $0.0125 increase in its quarterly distribution rate to $0.5125 per FGP common unit ($2.05 on an annualized basis), effective following the closing of the transaction.

Founded in 2010, Bridger owns and operates assets across the midstream value chain and can provide end-to-end crude oil logistics, including trucking, terminaling, pipeline, rail, and maritime, from the wellhead to end markets across North America. Bridger has operations in 14 states and virtually all major U.S.

crude oil production regions, including the Permian, Bakken, Rockies, Niobrara, Mid-Continent, Gulf Coast, and Eagle Ford.

The move positions Ferrellgas to significantly expand its midstream platform and is expected to be immediately accretive to Ferrellgas and supportive of future distribution growth. The company, which is the nation's second largest propane retailer and the nation's largest provider of propane by portable tank exchange, established a midstream division on May 1, 2014, when it acquired Sable Environmental, LLC.

"We are extremely pleased to welcome Bridger into the Ferrellgas family," **Stephen L. Wambold**, Chief Executive Officer and President of Ferrellgas, said. "It is a remarkable organization with a proven record of developing robust midstream assets and executing long-term growth initiatives. We'll benefit greatly from their collective experience and deep customer relationships as we continue to pursue midstream-focused growth opportunities."

Bridger, which was named Inc. Magazine's "Fastest Growing Energy Company" in 2013, will continue to operate as an independent entity inside of Ferrellgas.

**Julio Rios**, President and Chief Executive Officer of Bridger, will continue to oversee its operations and will report directly to Mr. Wambold. "Today marks another exciting step in Bridger's history," said Rios. "We believe in Ferrellgas' long-term strategic vision, and its collective resources create an opportunity for us to expand Bridger's existing midstream footprint and continue to provide an unmatched level of service to our customers."

With the addition of Bridger, Ferrellgas now offers a comprehensive portfolio of crude-focused midstream assets, diversifying its existing asset base and creating a platform from which to execute its long-term midstream growth initiatives.

"This is a landmark transaction for Ferrellgas and represents a key milestone in our diversification efforts," said **Todd Soiefer**, Ferrellgas' Senior Vice President of Strategic Development. "Bridger's established and growing footprint of crude logistics assets allows us to strategically diversify our existing business and add significant scale to our growing midstream platform."

**Transaction Overview**

The $837.5 million purchase price represents an approximately 8.4x multiple of estimated next twelve months Bridger EBITDA of $100 million. The consideration will consist of approximately $562.5 million of cash and 11.2 million Ferrellgas common units issued directly to the sellers. Bridger's core executive management team will join Ferrellgas, ensuring a smooth transition and a continued focus on strategic execution. The transaction is expected to close by July 1, 2015 and is subject to customary closing conditions.

48.     On June 9, 2015, Ferrellgas issued a press release announcing its financial results for the third quarter ended April 30th of fiscal year 2015.  The press release claimed, in particular, "The Bridger transaction, scheduled to close in our fourth quarter 2015, is expected to be immediately accretive to [distributable cash flow], supportive of distribution growth, and pushes the company to its near-term diversification goal."  The press release stated:

**Ferrellgas Partners Reports Third Quarter Results; Reaffirms Guidance for Fiscal 2015 Adjusted EBITDA**

OVERLAND PARK, Kan., June 9, 2015 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) announced today Adjusted EBITDA of $96.3 million for fiscal 2015's third quarter ended April 30, down 4% from the $99.8 million in the prior year quarter reflecting temperatures that were 6% warmer than prior year quarter. Distributable Cash Flow (DCF) to equity investors in the quarter was $70.0 million producing DCF coverage of 1.12x for the trailing twelve month period.

Propane margin cents per gallon benefited from wholesale commodity prices that were 54% lower than the prior year. Operating expense of $106.9 million was down more than 6% from the year-ago level driven primarily by the company's ability to flex down our variable delivery costs, including personnel and fuel cost, which more than offset additional operating expenses associated with our midstream acquisition in May of 2014. Strong margin cents per gallon and lower operating expenses helped minimize the effect of warmer temperatures in the more highly concentrated geographic areas we serve.

"We are pleased with our third quarter results given the challenges presented by the warmer weather" said President and Chief Executive Officer Stephen L. Wambold. "Strong propane margins, operational flexibility, and a continued focus on expense discipline in our retail operations are continuing to offset the effect of the warmer temperatures, and as such we are comfortable reaffirming our full-year adjusted EBITDA guidance of $300 million to $320 million."

Ferrellgas recently announced the acquisition of Bridger Logistics, LLC for $837.5 million. The Bridger transaction, scheduled to close in our fourth quarter 2015, is expected to be immediately accretive to DCF, supportive of distribution growth, and pushes the company to its near-term diversification goal. In addition to that achievement, Ferrellgas remains dedicated to the aggressive pursuit of accretive, complementary acquisitions in both the traditional propane space and midstream.

"We've made smart business decisions over the last few years and put ourselves in position to move boldly and decisively on the acquisition front," Wambold said.

"Our acquisition pipeline is strong and keeps getting stronger, and we remain committed to exploring a wide range of opportunities that fit our model and our culture."

For the first nine months ended April 30 of fiscal 2015, Adjusted EBITDA improved to $267.6 million, up from $262.6 million posted in the first nine months of the prior fiscal year. Similar to our quarterly results, strong margin cents per gallon and operating expense declines offset temperatures that were 8% warmer than the fiscal 2014 period. Net earnings were $89.4 million or $1.06 per unit for the first nine months of fiscal 2015.

49.     On the same day, Ferrellgas filed its Quarterly Report on Form 10-Q for the fiscal quarter ended April 30, 2015 with the U.S. Securities and Exchange Commission ("SEC"). The Partnership's Form 10-Q was signed by defendant Heitmann, and affirmed the Partnership's financial results announced in the press release issued the same day.

50.     On September 29, 2015, Ferrellgas issued a press release announcing its financial results for fiscal year 2015 ended July 31, 2015. While acknowledging that the weather was negatively effecting the Partnership's results, defendant Wambold touted defendants' "focus on … diversification strategy" as a reason for Ferrellgas' continued success. The press release stated:

**Ferrellgas Partners, L.P. Reports Record Adjusted EBITDA for Fiscal 2015**

OVERLAND PARK, Kan., Sept. 29, 2015 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) today announced record Adjusted EBITDA of $300.2 million for fiscal 2015, up 4% from the previous year of $288.1 million despite temperatures that were 8% warmer than the prior year. Distributable Cash Flow (DCF) to equity investors for the year was $189.6 million, producing DCF coverage of 1.12x for the 12-month period.

"We are thrilled to present strong results to our investors despite weather that was a hindrance to our core propane business," said President and Chief Executive Officer Stephen L. Wambold. "Strong propane margins, operational flexibility, a continued focus on expense discipline in our retail operations and our focus on our diversification strategy allowed us to offset the effect of the warmer nationwide temperatures Mother Nature handed us throughout the year."

Propane margin cents per gallon benefited from wholesale commodity prices that were 43% lower than the prior year. Operating expense of $432.3 million was

down more than 3% from the year-ago level, driven primarily by the company's ability to flex down variable delivery costs, including personnel and fuel cost, which more than offset additional operating expenses associated with the full-year impact our midstream water solutions acquisition in May of 2014 and the impact of our Bridger Logistics, LLC ("Bridger") acquisition in the fourth quarter.

Strong margin cents per gallon and lower operating expenses helped minimize the effect of warmer temperatures in the more highly concentrated geographic areas we serve. General and administrative expense rose to $56.4 million from $46.0 million, primarily attributable to one-time transaction costs associated with the Bridger acquisition of $16.4 million. Interest expense increased to $100.4 million from $86.5 million, reflecting increased borrowings to fund acquisition and growth capital expenditures. Net earnings for the year were $30.1 million, or $0.35 per common unit, compared to $33.7 million, or $0.41 per common unit.

During the fourth quarter Ferrellgas closed on its previously announced $822.5 million acquisition of Bridger. The Bridger transaction is a significant step toward Ferrellgas' near-term diversification goals. Ferrellgas remains dedicated to the aggressive pursuit of accretive, complementary acquisitions in both the traditional propane space and midstream.

"Our acquisition of Bridger contributed nearly $8.6 million of Adjusted EBITDA during the short period of time we've owned these high-quality assets, and we continue to believe Bridger will meet or exceed our expectations in fiscal 2016," Wambold said. "We've made smart business decisions over the last few years and put ourselves in position to move boldly and decisively on the acquisition front. Our midstream and propane acquisition pipelines remain robust, and we remain committed to exploring a wide range of opportunities that fit our strategic model and our growth culture."

51.     On the same day, Ferrellgas filed its Annual Report on Form 10-K for the fiscal year ended July 31, 2015 with the SEC. The Partnership's Form 10-K was signed by defendants Wambold, Ferrell, and Heitmann, and affirmed the Partnership's financial results announced in the press release issued the same day.

52.     On December 9, 2015, Ferrellgas issued a press release announcing its financial results for the first quarter ended October 31st of fiscal year 2016.  The press release focused heavily on the Bridger Acquisition, stating that the Partnership was successfully diversifying into a midstream master limited partnership.  The press release stated:

**Ferrellgas Partners, L.P. Reports Results for First Quarter Fiscal 2016**

*Strong Performance From Bridger With Meaningful Progress on Acquisition Integration*

*Ferrellgas Continues Successful Ongoing Transformation Into a Diversified Midstream MLP*

OVERLAND PARK, Kan., Dec. 09, 2015 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) today announced Adjusted EBITDA of $48.9 million for the first quarter of fiscal 2016 ended October 31, up 42% from $34.4 million in the same quarter of last year, due to strong results from the Bridger acquisition, which the partnership completed in June 2015. Distributable Cash Flow (DCF) to equity investors for the quarter was $11.2 million, producing DCF coverage of 1.08x for the trailing twelve month period.

President and Chief Executive Officer Stephen L. Wambold commented, "We are excited to report a solid first quarter that represents our first full quarter of combined results following the completed acquisition of Bridger and officially welcoming the organization into the Ferrellgas family. We continue to integrate Bridger, which will serve as a platform for continued midstream growth and diversification. We are also encouraged by the continued solid financial and operational performance of our Propane segment. While persisting warmer nationwide temperatures during our first fiscal quarter put pressure on our Propane segment's results, our flexibility, focus on maintaining strong margins and commitment to containing retail expenses allowed us to offset the unfavorable operating environment."

Mr. Wambold concluded, "We are more excited than ever about the future of Ferrellgas and the strong pipeline of acquisition and organic development opportunities. With our acquisition of Bridger we have established a firm foundation for a powerful midstream growth platform and we expect to continue developing our already diverse footprint and extensive customer base in high-growth regions over the course of fiscal 2016 and beyond."

Propane margin cents per gallon continued to benefit from lower wholesale commodity prices, and during the first fiscal quarter, prices were 57% lower than those of the same quarter in fiscal 2015. Strong margin cents per gallon and lower operating expenses in the Propane and related equipment sales segment helped minimize the effect of warmer temperatures in the more highly concentrated geographic areas Ferrellgas serves. Temperatures were 31% warmer than normal and 13% warmer than prior year for the first fiscal quarter.

Adjusted EBITDA from the Midstream - Crude Oil Logistics segment was $24.8 million during the first fiscal quarter, driven exclusively by the Bridger acquisition which exceeded management's expectations for the first full fiscal quarter subsequent to the closing of the acquisition. These results reflect management's

focus on expense controls as well as Bridger's strong customer relationships and contractual agreements which helped navigate a volatile commodity price environment. The partnership is on pace to generate $100 million of adjusted EBITDA in this segment for full-year fiscal 2016.

Operating expense for the first quarter increased to $115.0 million from $102.9 million in the first fiscal quarter of 2015, primarily due to the additional operating expenses associated with the Bridger acquisition. General and administrative expense rose to $12.2 million from $10.8 million in the fiscal first quarter of 2015, also as a result of the acquisition.

Interest expense increased to $33.8 million for the first fiscal quarter from $23.9 million a year ago, reflecting increased borrowings to fund acquisition and growth capital expenditures. The seasonal Net loss for the quarter was $80.6 million, or $0.79 per common unit, compared to $33.2 million, or $0.40 per common unit in the prior year quarter. The increase in seasonal Net loss is due in part to a one-time, non-cash goodwill write-off related to the partnership's midstream water solutions operations and a one-time loss on trucks held for sale.

Ferrellgas today also reaffirmed its previously provided estimates for full-year fiscal 2016 Adjusted EBITDA of $400 million to $420 million based on continued confidence in the partnership's traditional retail operations and expected strong contributions from Bridger.

53.     On the same day, Ferrellgas filed its Quarterly Report on Form 10-Q for the fiscal quarter ended October 31, 2015 with the SEC. The Partnership's Form 10-Q was signed by defendant Heitmann, and affirmed the Partnership's financial results announced in the press release issued the same day.

54.     On March 10, 2016, Ferrellgas issued a press release announcing its financial results for the second quarter ended January 31st of fiscal year 2016.  Defendant Wambold continued to tout Bridger, claiming at one point that it "continues to exceed our expectations." The press release stated:

**Ferrellgas Partners, L.P. Reports Results for Second Quarter Fiscal 2016**

*Year-Over-Year Increase in Adjusted EBITDA Reflects Successful  Execution of Diversification Strategy*

OVERLAND PARK, Kan., March 10, 2016 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) today announced Adjusted EBITDA of $138.3 million

for the second quarter of fiscal 2016 ended January 31, 2016, an increase from $136.9 million in the prior year period.

President and Chief Executive Officer Stephen L. Wambold commented, "Despite this being one of the warmest winters on record, our ongoing midstream diversification efforts allowed us to deliver a year-over-year increase in Adjusted EBITDA. Bridger continues to exceed our expectations and we are carefully controlling costs to help offset the challenging operating environment for our Propane and related equipment sales segment."

Mr. Wambold continued, "Looking ahead to the second half of our fiscal year, we will maintain focus on operations and strategic execution. Additionally, we will continue to consider value-enhancing organic and external growth initiatives to mitigate the impact of continued warm weather and capitalize on opportunities created by low crude oil prices. We have ample financial flexibility to drive growth without accessing the capital markets, and we are confident that we have the pieces in place to create significant value for all Ferrellgas unitholders."

Continued strong expense controls in the Propane and related equipment sales segment helped offset the impact of elevated temperatures, which were 19% warmer than normal and 16% warmer than the prior year period.

Adjusted EBITDA from the Midstream - Crude Oil Logistics segment was $28.7 million during the second fiscal quarter, which exceeded management's expectations. These results reflect the strength of Bridger's customer relationships amid sustained volatility in commodity pricing, and management's ability to carefully control expenses and drive efficiencies.

Operating expense for the second fiscal quarter increased to $116.5 million from $107.1 million in the prior year period, due to incremental operating expenses from Bridger and non-cash items related to the changes in fair value of fuel derivatives and contingent consideration in the current year and prior year, respectively.

Interest expense totaled $34.7 million for the second fiscal quarter, compared to $24.4 million a year ago, largely due to $500 million of notes issued in connection with the Bridger acquisition in June 2015.

Net earnings for the quarter was $57.8 million, or $0.58 per common unit, compared to net earnings of $86.4 million, or $1.02 per common unit, in the prior year quarter. The decrease in net earnings is due in part to the increase in interest expense discussed above and warm weather, as well as depreciation and amortization expenses related primarily to the Bridger transaction.

Ferrellgas also today announced that, due to sustained warmer temperatures and the current commodity price environment, it is revising its previously announced estimates for full-year fiscal 2016 Adjusted EBITDA to a range of $360 million to $375 million. Based on the midpoint of the Partnership's fiscal 2016 estimates for

Adjusted EBITDA, Ferrellgas expects its DCF coverage ratio to increase to above 1.0 by the end of the fiscal year.

55.     On the same day, Ferrellgas filed its Quarterly Report on Form 10-Q for the fiscal quarter ended January 31, 2016 with the SEC.   The Partnership's Form 10-Q was signed by defendant Heitmann, and affirmed the Partnership's financial results announced in the press release issued the same day.

56.     On June 8, 2016, Ferrellgas issued a press release announcing its financial results for the third quarter ended April 30th of fiscal year 2016.   Again, defendant Wambold pointed out Bridger as a bright spot for the Partnership, stating that it "continues to perform well."   The press release stated:

**Ferrellgas Partners, L.P. Reports Results for Third Quarter Fiscal 2016**

OVERLAND PARK, Kan., June 08, 2016 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) ("Ferrellgas" or the "Company") today reported financial results for its third fiscal quarter ended April 30, 2016. The Company reported Net earnings attributable to Ferrellgas Partners, L.P. of $18.7 million, compared to $35.8 million for the quarter ended April 30, 2015.

Adjusted EBITDA was $108.0 million, an increase of 12% over the same quarter last year, including $25.2 million of Adjusted EBITDA from the Bridger Logistics acquisition which was completed in June of 2015.

"Like many in our industry, we continue to be impacted by the extremely warm temperatures nationwide, and the downturn in the commodities market, including lower crude oil prices and project delays and cancellations," said Stephen L. Wambold, President and Chief Executive Officer. "We experienced an average of 18% warmer weather than normal during the quarter, which reduced heating needs across all our geographies and significantly drove down propane segment volumes and revenues. Notwithstanding these operating conditions, we are pleased to have delivered a 12% year-over-year increase in Adjusted EBITDA."

Mr. Wambold continued, "Bridger continues to perform well, providing gross profits and adjusted EBITDA in our third quarter that more than offset decreases in our water solutions and propane segments. Importantly, we remain focused on reducing expenses and continue to evaluate value-enhancing organic and external growth opportunities to drive growth and mitigate the impact of the challenging operating environment. We expect our distributable cash flow coverage to rebound to more than 1.0x by the end of 2016, with leverage dropping below 5.0x. We

continue to execute against our strategic plan and remain confident that we have the initiatives in place to create value for all Ferrellgas unitholders."

Continued strong expense controls in the Propane and related equipment sales segment and strong results from the Midstream Crude Oil segment helped offset the impact of elevated temperatures, which were 18% warmer than normal and 21% warmer than the prior year period.

Even though there were strong expense controls, due to the Bridger Transaction, Operating expense and General and administrative expense for the third fiscal quarter increased to $115.1 million and $12.4 million respectively.

Interest expense totaled $34.4 million for the third fiscal quarter, compared to $23.5 in the prior year period, primarily due to $500 million of notes issued in connection with the Bridger acquisition in June 2015.

Net earnings for the quarter were $18.9 million, or $0.19 per common unit, compared to net earnings of $36.2 million, or $0.43 per common unit, in the prior year period. The decrease in net earnings is primarily related to the impact of warm weather on our propane and related equipment sales segment and the increases in Depreciation and amortization expense and interest expense both primarily related to the acquisition of Bridger.

57.     On the same day, Ferrellgas filed its Quarterly Report on Form 10-Q for the fiscal quarter ended April 30, 2016 with the SEC. The Partnership's Form 10-Q was signed by defendant Heitmann, and affirmed the Partnership's financial results announced in the press release issued the same day.

**THE TRUTH EMERGES**

58.     The truth behind the Partnership's business prospects and Individual Defendants' wrongdoing began to emerge on September 28, 2016. On that day, Ferrellgas issued a press release announcing its financial results for fiscal year 2016 ended July 31, 2016. In the press release, Ferrellgas reported a net loss of $665.4 million as a result of an impairment charge of $628.8 million to the Partnership's Midstream operations. The press release claimed that it was "possible" that the Partnership would reduce its distribution to $1.00 per unit form its current level of $2.05 per unit. The press release stated:

**Ferrellgas Partners, L.P. Reports Fiscal 2016 Earnings**

OVERLAND PARK, Kan., Sept. 28, 2016 (GLOBE NEWSWIRE) – Ferrellgas Partners, L.P. (NYSE:FGP) ("Ferrellgas" or the "Company") today reported financial results for the full fiscal year ended July 31, 2016.

The Company reported a net loss attributable to Ferrellgas Partners, L.P. of $665.4 million, compared to net earnings attributable to Ferrellgas Partners, L.P. of $29.6 million in the full fiscal year 2015. The net loss for the current fiscal year includes a one-time non-cash impairment charge of $628.8 million in our Midstream operations – Crude oil Logistics segment and a one-time non-cash impairment charge of $29.3 million in our Other midstream operations – water solutions reporting unit.

The Company also announced Adjusted EBITDA of $344.7 million for fiscal 2016, an increase of 14.8% from $300.2 million in the previous year.

Continued strong expense controls in the Propane and related equipment sales segment helped offset the impact of elevated temperatures, which were 19% warmer than normal and 16% warmer than the prior year period. Interest expense totaled $137.9 million for the full fiscal year in 2016, compared to $100.4 million in the prior year, primarily due to $500 million of notes issued in connection with the Bridger acquisition in June 2015.

"As we highlighted last quarter, record temperatures across the nation continue to have an adverse impact on the propane sector of our company and low oil prices have seriously damaged our midstream sector." said James E. Ferrell, Interim President and Chief Executive Officer. "In particular, unusually warm winters over the past two years drove down propane sales across all our geographies, and low crude oil prices have negatively impacted our midstream logistics business."

Because of the increase in debt incurred to fund the Bridger acquisition, the recently announced Jamex settlement and the effects of the record warm temperatures in fiscal 2016, our leverage ratio has increased to levels approaching the 5.5x limit provided in our secured credit facility and accounts receivable securitization facility. On September 27, 2016, Ferrellgas obtained an amendment under the secured credit facility and accounts receivable securitization facility pursuant to which the maximum leverage ratio is increased to a range of 5.95x to 6.05x over the next six quarters.

Further, the Company is focused on the reduction of its debt and leverage ratio. One tactic under consideration is a reduction in our quarterly distribution, which will continue to be determined by the board of directors of our general partner on a quarter-by-quarter basis. The distribution for the first quarter of fiscal 2017 has not yet been determined, but our board believes that it is possible that the annual distribution rate may be reduced from $2.05 to approximately $1.00 per common unit. Any such reduction, together with any other debt-reducing actions taken

would likely remain in effect until our leverage ratio reaches a level that we deem appropriate for our business.

Mr. Ferrell stated, "In light of the recent developments related to our Jamex settlement, a prolonged downturn in the midstream sector, as well as two full years of erratic weather patterns driving down propane demand, we are taking prudent action at this time to preserve capital and improve the Company's financial position. We are committed to strengthening our balance sheet by de-levering in a meaningful way. We are confident this action will support the long-term interests of our unitholders, employee-owners and other stakeholders, and we look forward to growth in distribution when our leverage ratio and debt return to more reasonable levels."

59.     The Partnership also announced that day that defendant Wambold had resigned from Ferrellgas and defendant Ferrell would take over as Interim-President and CEO, effective immediately.

60.     On this news, shares of Ferrellgas units fell $4.73 per share, a market capitalization drop of over $459 million, or approximately 28%, over two trading days to close at $11.77 per share on September 29, 2016.  Further, on October 6, 2016, the first of numerous securities class action complaints was filed against the Partnership alleging that the improper statements above misled unitholders into purchasing Ferrellgas' units at inflated prices.

61.     The September 28, 2016, press release, however, did not come close to revealing the drastic steps Ferrellgas would need to take to recover from the Bridger debacle.   On November 22, 2016, Ferrellgas announced that it would cut its distribution to $0.10 per quarter ($0.40 annualized), significantly more than what defendant Ferrell said it would.  On November 23, 2016, Ferrellgas' unit price fell another 9%, erasing another $66 million of market capitalization.

## REASONS THE STATEMENTS WERE IMPROPER

62.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the defendants knew, consciously disregarded, or were reckless in not knowing:

      (a)     the Bridger Acquisition was devastating the Partnership;

      (b)     Jamex was not performing under its obligations; and

      (c)     the Partnership would need to reduce its distribution, including significantly more than originally warned.

## DAMAGES TO FERRELLGAS

63.     As a result of the Individual Defendants' improprieties, Ferrellgas disseminated improper, public statements concerning the Bridger Acquisition, its related dealings, and the cut to the Partnership's distribution.   These improper statements have devastated Ferrellgas' credibility as reflected by the Partnership's over $1.2 billion, or 59.9%, market capitalization loss.

64.     Ferrellgas' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Ferrellgas' current and potential customers consider a company's ability to perform on contracts.  Businesses are less likely to award contracts to companies that are unable to perform on contracts and have problems providing quality service, as Bridger failed to provide Monroe.

65.     Importantly, Ferrellgas' ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Partnership stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the defendants have materially increased the perceived risks of investing in and lending money to the Partnership.  In fact, the recent

January debt offering of senior notes, on information and belief, was on less favorable terms due to the defendants' improper actions described herein.

66.     Further, as a direct and proximate result of the defendants' actions, Ferrellgas has expended, and will continue to expend, significant sums of money in defense (and potential settlement and judgement) of the securities class actions and the action brought by Eddystone Rail.

## CLASS ALLEGATIONS

67.     Plaintiff bring this action individually and as a class action on behalf of a class consisting of all public holders of the Partnership units during the period of June 1, 2015 through the present (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

68.     This action is properly maintainable as a class action because:

(a)     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are more than ninety-seven million Ferrellgas limited partnership units held by hundreds, if not thousands, of holders.

(b)     There are questions of law and fact that are common to members of the Class, including, inter alia, the following, which predominate over any questions affecting only individual class members:

- whether defendants misled the members of the Class;

- whether defendants' actions constitute a breach of the Partnership Agreement; and

- whether defendants' actions constitute a breach of the implied covenant of

good faith and fair dealing.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(d)     No difficulties are likely to be encountered in the management of this action as a class action.

(e)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of Ferrellgas to redress injuries suffered, and to be suffered, by Ferrellgas as a direct result of the failure to act in good faith and breach of the duty of good faith and fair dealing, as well as the aiding and abetting thereof, by the Individual Defendants.  Ferrellgas is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiff will adequately and fairly represent the interests of Ferrellgas in enforcing and prosecuting its rights.

71.     Plaintiff was a unitholder of Ferrellgas at the time of the wrongdoing complained of, has continuously been a unitholder since that time, and is a current Ferrellgas unitholder.

72.     The Partnership does not have a Board of Directors, instead operating solely through the General Partner.   Plaintiff has not made a demand on the General Partner to bring

suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law. The misleading statements detailed herein were made by officers of the General Partner in the course of their duties and therefore their knowledge and statements, and thus the wrongdoing, are attributable to the General Partner. It would be futile to require Plaintiff to issue a demand to the General Partner requesting it to take action against itself for its conduct as alleged herein. Not only would this require the General Partner to investigate and bring claims against itself for its own misconduct, but the General Partner's actions to date also prove conclusively that it will not take action.

73.     Under Delaware law, demand is excused as futile unless "the [entity] that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

74.     As summarized below and specified herein, demand is excused because this Complaint alleges with particularity that the defendants breached the Partnership Agreement and their duties to the limited partners by failing to act in good faith when making public statements about the Partnership. Demand is futile because the General Partner cannot be presumed to exercise independent judgment in assessing the merits of a demand due to its financial interest in the subject matter of the claims raised in this Complaint.

75.     The General Partner would control an investigation of the wrongdoing that Plaintiff alleges violated the Partnership Agreement as well as the General Partner's duties of good faith and fair dealing.

76.     Ferrellgas' limited partners have no influence over the General Partner's operations, and they do not have the ability to vote for the General Partner's Board.

77.     Accordingly, demand on the General Partner is excused.

78.     Plaintiff has not made any demand on the other stockholders of Ferrellgas to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Ferrellgas is a publicly held company with over 97.1 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the General Partner for Breach of Contract
### in Connection with the Failure to Act in Good Faith

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     The Partnership Agreement constitutes a contract between the General Partner and the limited partners of Ferrellgas.

81.     Ferrellgas' limited partners are the intended beneficiaries of the protections afforded by the Partnership Agreement, which obligates the General Partner to act in good faith.

82.     The General Partner made numerous improper statements, which inflated Ferrellgas' stock price.  When the truth was revealed, the Partnership's stock price plummeted.

83.     As a result, Plaintiff and Class members have suffered damages and will continue to suffer damages as the wrongdoing described herein continues to unfold.

## COUNT II

**Against the General Partner for Breach of the Duty of Good Faith and Fair Dealing**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     Under the terms of the Partnership Agreement, the General Partner owes and owed Ferrellgas and Ferrellgas' limited partners, including Plaintiff and the Class, a duty of good faith and fair dealing, and are prohibited by these duties from misleading Plaintiff and Class members about the operations of the Partnership.

86.     In contravention of the General Partner's good faith obligations to Ferrellgas and to Plaintiff and members of the Class, it has made improper statements about the Partnership's health and the General Partner's obligation of it.

87.     As a result of the General Partner's breaches, as discussed above, Ferrellgas, including Plaintiff and members of the Class, have suffered damages.

## COUNT III

**Against the Individual Defendants for Aiding and Abetting
the General Partner's Breach of the Duty of Good Faith and Fair Dealing**

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     As alleged above, the General Partner has breached its duty of good faith and fair dealing owed to Ferrellgas, Plaintiff, and members of the Class.

90.     The Individual Defendants made the improper statements and directed the General Partner's improper conduct described herein.

91.     As a result of the General Partner's conduct, as discussed above, Ferrellgas, including Plaintiff and members of the Class, have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Ferrellgas, demands judgment as follows:

A.     Finding that demand on the General Partner would be futile;

B.     Declaring that this action is properly maintainable as a class action;

C.     Finding that the General Partner breached its contractual duties to Plaintiff and Class members, by failing to act in good faith;

D.     Finding that the Individual Defendants aided and abetted the General Partner's breaches of its contractual duties to Plaintiff and Class members, by failing to act in good faith;

E.     Finding that the General Partner breached its duty of good faith and fair dealing to Ferrellgas, including Plaintiff and the Class, by failing to act in good faith;

F.     Finding that the Individual Defendants aided and abetted the General Partner's breaches of its duty of good faith and fair dealing to Ferrellgas, including Plaintiff and the Class, by failing to act in good faith;

G.     Against all of the defendants and in favor of the Partnership for the amount of damages sustained by the Partnership as a result of the defendants' violations;

H.     Against all of the defendants and in favor of the Class for the amount of damages sustained by the Class as a result of the defendants' violations;

I.     Awarding damages (including punitive damages), together with pre- and post-judgment interest;

J.     Directing the General Partner to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ferrellgas and its unitholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for unitholder vote, resolutions for amendments to the

Partnership Agreement to ensure independent oversight of the General Partner;

K.      Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

L.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Ferrellgas has an effective remedy.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 16, 2017

WRIGHT SCHIMMEL LLC

*Charles T. Schimmel*

CHARLES T. SCHIMMEL (KS #18357)
W. GREGORY WRIGHT (KS #18352)
6900 College Boulevard, #285
Overland Park, KS 66211
Telephone: (913) 534-8534
Facsimile: (913) 534-8536
E-mail: chuck@wrightschimmel.com
        greg@wrightschimmel.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
STEVEN M. MCKANY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        gaguilar@robbinsarroyo.com
        smckany@robbinsarroyo.com

Attorneys for Plaintiff

1156048